## Richmond

### United States Fidelity and Guaranty Company v. The Country Club of Virginia, Inc.

January 28, 1921.

Absent, Prentis, J.

1. SURETYSHIP.—*False Representations in Application for Bond— Burden of Proof—Case at Bar.*—In an action against a surety .on the bond of the secretary-treasurer of a country club, a plea that the club falsely represented that the secretary-treasurer had never been in arrears or default while in the club's service, and that his accounts were correct and there was no shortage at the time of the application for the bond was good if sustained by the evidence. The burden of proof, however, was on the surety, and, in the instant case, was not sustained.

2. SURETYSHIP.—*False Representations in Application for Bond— Case at Bar.*—Items of indebtedness of the secretary-treasurer of a country club to the club, as a member of the club, secured by his notes, are not such items of indebtedness as were contemplated by a statement made by the club to the surety of the secretary-treasurer that the secretary-treasurer had never been in arrears or default while in the club's service.

3. APPEAL AND ERROR.—*Reversal—Weight of Verdict.*—A verdict approved by the trial court cannot be disturbed by the Supreme Court of Appeals unless it is wholly without evidence to support it, or is so plainly wrong as to leave no doubt upon the subject.

4. SURETYSHIP.—*Liability of Surety of Secretary-Treasurer of a Country Club—Case at Bar.*—A note given by the secretary-treasurer of a country club as payment by him on a share of stock of the club, which went into the hands of the secretary-treasurer as such officer, imposed liability on the surety of the secretary-treasurer for his failure to account for the note to the same extent as if it had been the note of a third person, and the surrender of the certificate of stock by the secretary-treasurer did not exempt the surety from liability, as such

surrender simply reinstated the certificate to its proper custody, the club having a lien on the certificate till the stock was paid for.

5. SURETYSHIP.—*Liability of Surety of Secretary-Treasurer of a County Club—Case at Bar.*—A debtor to a country club gave his check to the secretary-treasurer of the club, who credited the debtor with the amount of the check on the members' ledger and deposited the check to the credit of the club in the bank, but failed to charge his cash account with it. Notwithstanding this failure, the cash account balanced.

   *Held:* That the surety of the secretary-treasurer was liable for the amount of the check.

6. SURETYSHIP.—*Liability of Surety of Secretary-Treasurer of a Country Club—Case at Bar.*—An employee of the secretary-treasurer of a country club, who was in charge of the club, when he left turned over to the secretary-treasurer of the club all of the assets belonging to the petty cash account, and took his receipt therefor.

   *Held:* That the secretary-treasurer and his surety were liable for these assets, as his receipt was an admission, not only of the receipt of the sum specified, but of the fact that it belonged to the club.

7. SURETYSHIP.—*Liability of Surety of Secretary-Treasurer of a Country Club—Case at Bar.*—Where in an action upon the bond of a secretary-treasurer of a country club, the secretary-treasurer claimed that a certain item charged on the books of the club was never any liability on him, but was a mere adjustment entry for which he was not responsible, but the expert accountant employed to examine the accounts took the view that it was not a mere adjustment entry, but that the club sustained a loss, the question of liability for the item was plainly one for the jury under proper instructions.

8. SURETYSHIP.—*Secretary-Treasurer of Country Club—Instructions.*—In an action against a surety on the bond of the secretary-treasurer of a country club, defendant asked the court to instruct the jury that they could not consider any item of claim occurring prior to May 1, 1917. In lieu thereof, the court instructed the jury that they could not consider pecuniary loss to the plaintiff arising from any ietm in the claim made by the plaintiff, if the loss from such item had occurred prior to May 1, 1917, and was not caused by acts of fraud or dishonesty committed by the secretary-treasurer subsequent to May 1, 1917.

   *Held:* No error, as the instruction as given was more directly adapted to the evidence than the instruction requested.

9.   SURETYSHIP.—*Action on Bond of Secretary-Treasurer of Country Club—Instructions.*—In an action against a surety on the bond of the secretary-treasurer of a country club, the court was requested by defendant to instruct the jury to find for defendant if the "plaintiff refused to make the affidavit required" by the bond.

 *Held:* That if the words quoted referred to a certain affidavit required of plaintiff by defendant, but not authorized by the bond, it was rightly refused, as the defendant had no right to demand such affidavit; and if they referred to the affidavit required by the bond, there was no evidence to support the instruction, and the instruction was also equivocal.

10.   SURETYSHIP.—*Surety on Bond of Secretary-Treasurer of Country Club—Instructions.*—In an action against a surety on the bond of the secretary-treasurer of a country club, the court instructed the jury that in order for the plaintiff to recover, it must show that it sustained a loss by an act or acts of fraud or dishonesty committed by the secretary-treasurer in the performance of his duties during the continuance of the bond, or committed by any agent of the secretary-treasurer for whose acts he was responsible.

 *Held:* That while not as clearly expressed as it should be, the jury could not have been misled by the instruction.

Error to a judgment of the Law and Equity Court of the city of Richmond in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

          *Affirmed.*

The opinion states the case.

*David Meade White,* for the plaintiff in error.

*Pollard & Smith,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

E. A. Leitch executed to The Country Club of Virginia, Inc., a bond in the penalty of $3,000, with the United States Fidelity and Guaranty Company as surety, conditioned to

reimburse the club for all pecuniary loss sustained by it for money, securities, or other personal property in the possession of Leitch, or for the possession of which he might be responsible, by any act or acts of fraud or dishonesty committed by Leitch in the performance of his duties as secretary and treasurer of the club, occurring during the continuance of the bond, and discovered and notified to the surety within six months after the death, resignation or removal of Leitch prior to the expiration or cancellation of the bond. The bond was dated May 11, 1917, but was to be operative from May 1, 1917, to May 1, 1918. The bond was subject to certain conditions written therein, but the only one which it is necessary to mention is the second, which is as follows:

"2. The employer shall, within ninety (90) days after date of said notice, file with the surety an itemized claim hereunder duly sworn, and if required the employer shall produce for investigation by the surety at the office of the employer, all books, vouchers and evidence which may be required by the surety."

The bond was applied for by Leitch, and with his application there was filed a statement from the club, signed by its president, as a basis for the bond applied for. This statement was made as of December 21, 1916, and was on a printed form furnished by the surety and contained nineteen questions to be answered by the club. The questions and the answers thereto, so far as they need be given, were as follows:

"Q12. (a) What means will you use to ascertain whether his accounts are correct? (b) How frequently will they be examined? (c) How frequently will an inventory of the stock be taken? (d) If applicant is a salesman or collector, are statements rendered to customers in arrears, and at what period? (e) If applicant is an insurance agent, state period when reports and settlements are required.

"A.   a.   Audit by certified public accountant.   b.   Yearly. c. Secy.-Treas. has nothing to do with it except accept values submitted by committees.

"Q13.   When were his accounts last examined?

"A.   Has been in office only five months.

"Q14.   Were they at that time in every respect correct and proper securities and funds on hand to balance?

"A.   Yes.

"Q15.   Is there now or has there been any shortage due you by applicant?

"A.   No.

"Q16.   (a)   Is he now in debt to you?   (b)   If so, state amount and nature of such indebtedness?

"A.   a.   b.   No.

"Q17.   Have you any reason to know of or suspect any previous defalcation or shortage by the applicant, or any circumstances tending to indicate that he is not a proper person to bond?   If so, give particulars.

"A.   No."

Upon auditing the accounts of Leitch, he was found indebted to the club in the sum of $1,400.86, the items of which were as follows:

"For stock issued to E. A. Leitch ...... $75.00
Less:   Payments on petty cash book
    June, 1917 ..................... 30.00   $45.00

No notes found nor record of payment.

| | |
|---|---:|
| Capital stock premium—Dorsey Corley... | 15.00 |
| Credit to accounts receivable June 30, 1917 ........................... | 645.00 |
| Check of H. Stewart Jones, dated Sept. 28, 1917, not shown on cash book ...... | 135.00 |
| Check of Thos. A. Mott, dated Oct. 27, 1917, not shown on cash book ...... | 46.35 |

Receipt given by E. A. Leitch to D. R.
    Griffith on October 14, 1917, for cash
    and tickets ......................$659.53
Balance as shown by petty cash book,
    Oct. 14, 1917 ..................... 145.02 $514.51

      Total .............................$1,400.86"

A copy of this statement was promptly furnished the surety. Afterwards other items amounting to $28.05 were discovered and the surety was duly notified thereof and furnished a memorandum of the items. The total claim of the club was $1,428.91. Demand was made upon the Guaranty Company for this amount, but payment was refused, and this action was brought on the bond to recover the same. There was a verdict in favor of the club for the full amount of its claim, and a motion was made to set it aside because (1) it was plainly wrong; (2) it was excessive; (3) the jury was misdirected; and (4) the verdict was contrary to the law and the evidence. The trial court overruled the motion, and entered judgment for the plaintiff for the amount of the verdict. To that judgment the writ of error in this cause was awarded. The evidence sufficiently appears in the discussion of the several assignments of error.

In addition to the plea of non-assumpsit, the defendant filed a special plea setting up fraud and misrepresentation in the procurement of the bond in a written statement made by the plaintiff to the defendant to induce it to execute the bond bearing date December 21, 1917. The true time and date of the statement was December 21, 1916, and the year 1917 mentioned in the statement is plainly a clerical error. The plea alleges that by said statement "it was represented to this defendant that the said E. A. Leitch had never been in arrears or default in said plaintiff's service; that at that time, to-wit, December 21, 1917, his ac-

counts were in every respect correct, and that proper securities and funds were on hand to balance his accounts; that there was not then any shortage due to the said plaintiff by the said E. A. Leitch; that there had not been any shortage in the accounts of the said E. A. Leitch to the plaintiff; that the said E. A. Leitch was not then indebted to the said plaintiff; and that the said plaintiff had never sustained loss through the dishonesty of the said E. A. Leitch." The plea then alleges that said representations and each of them were false and untrue, and proceeds to negative the truth of each representation as made, and claims damages to the amount of the plaintiff's claim which it offers to set off against such claim. The plaintiff took issue on the plea.

[1, 2] The plea was good if sustained by the evidence. *Guarantee Co.* v. *Bank,* 95 Va. 480, 28 S. E. 909; *Atlantic Trust Co.* v. *Union Trust Corp.,* 110 Va. 286, 67 S. E. 182, 135 Am. St. Rep. 937.

Upon the trial of the issue made by this plea, the burden was on the defendant, but it was not sustained. There is abundant evidence in the record to sustain the finding of the jury in favor of the plaintiff. Among the items of indebtedness of Leitch as of December 21, 1916, sought to be shown were two, one for $103 and the other for $126.75. These items appeared on the books of the club on December 31, 1916, but both of them were closed by notes of Leitch which were charged to bills receivable. The item of $126.-75 was simply the account due by Leitch as a member of the club. "You go to the Country Club and have your dues charged, and you sign tickets for everything you get, from a glass of soda-water to a caddy ticket, and they are charged to your account and they send you a bill at the end of the month." This account had been running for some time prior to December 21, 1916. The other item of $103.25 was for money which Leitch had gotten out of the petty

cash drawer, and for which he had placed his cash tickets in the drawer. As to this item, there is "nothing on the books at all," until an entry was made on December 30th or 31st showing a note given therefor and charged to bills receivable. The withdrawals may have been made before or after December 21st. The certified· accountant who made the audit of the books of Leitch testified as to this item as follows:

"Q. But so far as the books show now, the only shortage in his accounts of December 21, 1916, was the debt he owed as a member of the Club?

"A. I would not consider that the $103.25 that Mr. Leitch owed the petty cash account would in any way be an embezzlement, because the examination of ninety-nine out of 100 establishments will show that every one of them have tickets in petty cash. The only shortage would be in a man's inability to pay. If I had found that Mr. Leitch had $100 of tickets in petty cash, I might have told him it was bad practice but I would not have considered that he was short because I would have considered that he was fully able to pay for them.

"Q. Would you report to us that he was short in his accounts?

"A. No, I would not; unquestionably I would not. I don't think I would have made a report to the finance committee of tickets in the box at all unless they had been there a considerable period, unless there was some good reason why I should. I would have considered Mr. Leitch good for the $103.25, I would not have considered it a shortage."

Leitch, the chief witness for the defendant testified that he was not short in his accounts on the day the application for the bond was signed. When asked specifically with reference to answers which he had filled out to questions propounded to the employer, he answered: "To my knowl-

edge I was not in debt to it. I believe that statement to be true." We do not regard either of these two items such an indebtedness as was contemplated by the parties in the statement demanded, and given as a basis for the bond in suit. It will sufficiently appear later on in this opinion that there was no other indebtedness of Leitch to the club on December 21, 1916.

[3] In dealing with the several items of the account sued on, it is to be borne in mind that they have been passed upon by a jury, whose verdict has been approved by the trial court, and that we cannot disturb that verdict unless it is wholly without evidence to support it, or is so plainly wrong as to leave no doubt upon the subject.

[4] The first item of the account is $45.00 balance due by Leitch on a share of stock issued to him. The price of the stock was $75.00, for which Leitch gave his note, and upon which he had paid $30.00. The club had a lien on the stock for the purchase price thereof, and under its regulations the stock could not be issued until fully paid for. Leitch, as secretary and treasurer of the club, issued the stock to himself, but the exact date thereof does not appear. Leitch admits that he gave his note for $75.00 for the stock, but claims that it has been paid. He produces no satisfactory evidence of such payment. The note was, or should have been, charged to bills receivable of the club but was not, and was not found among the bills receivable. "The note was shown as an asset of the club and could not be produced when asked for." The defendant claims that this was a personal transaction between Leitch and the club for which it is not bound upon the bond in suit. The note was an asset of the club, which went into the hands of Leitch as secretary and treasurer as much as if it had been the note of a third person, and the failure to account for it imposed liability to the same extent as if it had been the note of a third person. Pending the examination of

Leitch as a witness he surrendered the certificate of stock to counsel for the plaintiff, and for this reason defendant claims exemption from liability for the $45.00. The surrender of the certificate simply reinstated its proper custody and did not discharge the liability of either Leitch or the defendant for the balance due thereon.

The next item of the account is, "For capital stock premium of Dorsey Corley" $15.00. Liability for this item is practically admitted by Leitch in his testimony in the case.

[5] H. Stewart Jones was indebted to the club in the sum of $135, for which amount he gave his check to Leitch on September 28, 1917. Leitch credited Jones with that amount on the member's ledger and deposited the check to the credit of the club in bank, but failed to credit his cash account with it. The cash account consisted of two items, cash in bank and petty cash kept at the club for the convenience of members in making change, cashing checks and paying out small sums for the club. If the club got the benefit of this check, then cash (composed of the two items aforesaid) would be out of balance, and there would be $135 more of cash than the books called for. But such was not the fact. Cash balanced, so that petty cash must have been diminished by exactly $135. This was not explained by Leitch, though he was given every opportunity to do so. This amount was lost to the club, and the defendant is liable therefor. It is immaterial that Jones' check was placed to the credit of the club in bank, and that the club did get credit in bank for it. The failure to charge cash with it, after crediting Jones, resulted, as appears from the books, in a loss to the club of the sum of $135, which is spoken of as the Jones check in order to identify the transaction. The actual loss was in petty cash.

The item on the account of "Check of Thos. A. Mott, not shown on cash book," $46.35, stands on practically the same footing as the Jones check and need not be discussed.

[6]   The remaining two items of the account sued on are $645, credited to accounts receivable June 30, 1917, and $514.51 balance for cash and tickets as shown by a receipt given by Leith to his agent, Griffith, October 14, 1917, after deducting the balance shown by the petty cash book on that date.   The receipt was for $659.53, though the items foot up $676.13, while the petty cash book showed a credit to that account of only $145.02, and the difference between these two sums is the amount claimed by the plaintiff on this account.

The jury found both items in favor of the plaintiff. Griffith was an employee of Leitch and not of the club, and for four months had charge of the affairs at the club house.   When he left he turned over to Leitch all of the assets belonging to the petty cash account and took his receipt therefor.   These assets, amounting to $659.53, belonged to the club and Leitch was chargeable therewith, although the petty cash account on the books called for only $145.02.   Leitch's receipt to Griffith stated that the amount belonged to the "petty cash account" and was an admission not only of the receipt of the sum specified but of the fact that it belonged to the club.   In addition to this Griffith testified to these facts and gave the items composing it.   The fact that the transaction in which Leitch gave the receipt to Griffith was a personal one between the parties thereto, was immaterial and merely affected the means of proving that Leitch had that amount of the assets of the club in his hands at that time.   There was abundant evidence to sustain the finding of the jury as to that item of the account.

[7]   As to the item of $645, while the evidence is not quite so full and clear, it is sufficient to sustain the finding of the jury.   Leitch was personally interested in the matter, and it was upon his testimony that the defendant relied to escape liability for this sum.   Leitch's position on this

question was that there was never any liability on him for that item; that accounts receivable on the members' led-, ger did not agree with that account on the general ledger, and that the entry made by him was necessary to make the two accounts agree; that this difference had existed as far back as sometime in the year 1916; that there was never any liability on him for this difference, but that if he was held liable for it now, he was liable for it in 1916, before the bond was given; and that the entry of the credit of $645 to accounts receivable was a mere arbitrary entry to make the two ledgers correspond and did not represent any diminution of the assets of the club.

Leitch, in his testimony, associates the two items of $645 and $659.53 and says that "the $645 adjustment entry had a bearing evidently on the final settlement receipt which I gave to Mr. Griffith" for $659.53, and that if he is liable for one he is not liable for the other. The "bearing" is not evident, and it is singular that Leitch, an expert accountant, who ought to have been able to make it "evident" utterly failed to do so. Furthermore, Leitch's account of the entries made with reference to the $645 does not create a favorable impression. He admits that the entry was arbitrary and without authority from any one, and his statement that the club was a one-man affair, and that one man was the secretary-treasurer, should have made him meticulously careful that all of his acts should have been above suspicion. Not only was the entry without authority, but after crediting accounts receivable with the $645, he charges the amount first to inventory adjustment account, and afterwards charges it to repairs and renewal accounts, although he admits that never in his experience as a public accountant has he ever heard of such an item being placed under repairs and renewals. He further admits that "the object of making that entry to repairs and renewals was that it did not appear so prominently on his books."

While the expert accountant does not go into details in his testimony as fully as we should have desired, the results show that he necessarily took just the opposite view from that taken by Leitch; that the entry was not a mere adjustment entry for which Leitch was not responsible; that it was unauthorized; that the club sustained a loss of $645 in consequence thereof; that Leitch was responsible for the loss; and that the loss occurred in June, 1917. Instruction G very clearly informed the jury that the defendant could not be held liable except for acts of fraud or dishonesty committed by Leitch subsequent to May 1, 1917. The question of liability for this item was plainly one for the · jury. It was submitted to them under a proper instruction from the court, and their finding cannot be disturbed.

There were several small items added to the original account which are embraced in the judgment complained of, aggregating $28.05. Without going in detail into the evidence to support them, it is sufficient to say that the evidence was ample to support the verdict.

[8] The defendant asked the court to instruct the jury that, "they cannot consider any item of claim sued upon in this case, occurring prior to May 1, 1917." In lieu thereof, the court instructed the jury as follows:

"The court instructs the jury that they cannot consider pecuniary loss to the plaintiff arising from any item in the claim made by the plaintiff, if the loss to the plaintiff from such item had already occurred prior to May 1, 1917, and was not caused by any acts of fraud or dishonesty committed by E. A. Leitch subsequent to May 1, 1917."

In this there was no error. The instruction as given was more directly adapted to the evidence than the instruction requested.

[9] There was no error in refusing defendant's instruction No. 2. The bond sued on required the plaintiff to furnish the defendant "an itemized claim thereunder, duly sworn to." This the plaintiff did, but the defendant furnished the plaintiff with the form of an affidavit containing

a number of things that the officers of the plaintiff were unable to swear to, and hence refused to adopt it. The chief objection to the affidavit furnished by the plaintiff was that the affiant did not state that the loss occurred "by any acts of fraud or dishonesty" committed by Leitch. The condition of the bond did not require this, and hence it was not error to refuse the instruction which directed a finding for the defendant if the "plaintiff refused to make the affidavit required." If the words quoted referred to the affidavit required by the defendant, it was rightly refused as the defendant had no right to demand it; if they refer to the affidavit required by the bond, there was no evidence to support it, and the instruction was also equivocal. In either event, it was not error to refuse it.

[10] Instruction 3 tendered by the defendant was as follows: "In order for the plaintiff to recover in this case, it must show that it has sustained loss of money, securities or other personal property by an act or acts of fraud or dishonesty committed by E. A. Leitch in the performance of his duties as secretary-treasurer of the plaintiff club during the continuance of the bond." To this the court added, "or committed by any agent of E. A. Leitch during the continuance of the bond for whose acts he was responsible." The modification of the instruction by this addition thereto is assigned as error. The objection is two-fold. First, that the bond does not cover such liability unless it is shown that Leitch participated in such act or acts, and, second, that there is no evidence to support the proposition stated in the addition. We cannot assent to either proposition. Leitch was paid a salary as secretary-treasurer of the club, and as such had possession of the money, securities and other personal property of the club, except of money after it had been deposited in the bank. The security furnished by the bond was for all pecuniary loss, sustained by the club, of money, securities, or other personal property, in

the possession of Leitch, "or for the possession of which he is responsible," by any act or acts of fraud or dishonesty committed by him.   Leitch from time to time employed various persons to assist him in his duties, and from June 9, 1917, to October 14, 1917, D. R. Griffith was at the club house, in charge of the books and property of the club kept there and discharging practically all of Leitch's duties there.   All of these employees were the employees of Leitch alone.   He employed them, paid them out of his own pocket and discharged them.   The books of the club were the accounts of Leitch as secretary and treasurer, and he is responsible for the entries made thereon whether made by himself or by one of his employees.   If these entries showed a shortage in the accounts of Leitch, and there was nothing to show fraud or misconduct in connection therewith on the part of such employees, then the shortage was Leitch's shortage and for which there was a liability on his bond, if not explained by him, and that was what was intended to be covered by the amendment of the instruction. It is not as clearly expressed as it should have been, but we do not think the jury could have been mislead by it. Leitch, the chief witness for the defendant testified: "I do not attribute any wrongdoing, intentional wrongdoing, to anybody with whom I was connected out there, to any of my employees;" and the record is devoid of any evidence of fraud or misconduct on the part of any of such employees.

There was abundant evidence to justify the addition made by the court.   Leitch, time and again, in his testimony, seeks to justify or excuse his actions and the condition of his books by reference to the incompetency of his employees, and their inability to keep books and to balance cash.   This is especially so with reference to Griffith who had charge for four months.   We find no error in the modification made by the court.

Exception was also taken to the action of the trial court in permitting a question to be propounded to B. F. Dew,

the expert accountant who made the audit of the books, which is the foundation of this action, and to permitting him to answer such question. This matter has been sufficiently discussed in connection with the Jones check for $135, and the discussion need not be repeated. It is sufficient to say that the trial court committed no error in its ruling.

Objections to the verdict have been sufficiently disposed of in discussing other assignments of error.

We find no error in the proceedings of the trial court, and its judgment is therefore affirmed.

*Affirmed.*

Sims, J., dissenting:

The obligation of the surety bond sued on in this case extends no further than "to reimburse the employer" (the defendant in error) " * * for all pecuniary loss" (not exceeding three thousand dollars) "sustained by the employer of money, securities or other personal property in the possession of the employee," (E. A. Leitch), "or for the possession of which he is responsible, by any act or acts of fraud or dishonesty committed by the employee in the performance of the duties of the office or position" (of secretary-treasurer) "in the service of said employer * * occurring during the continuance of this bond * *"

The bond continued for one year only, from May 1, 1917, to May 1, 1918.

There is no direct evidence in the case to the effect that the liability established by the verdict and judgment under review, or any part of it, was a loss sustained by the said employer "by any act or acts of fraud or dishonesty committed by the employee" aforesaid; and, in my view of the evidence, there is none in the case which is not equally consistent with the inference that no fraud or dishonesty of said employee occasioned such loss or any part of it, as with any contrary inference.

41

As to portions of said liability, namely, the $45.00 balance owing by said employee for the stock of the club issued to him in 1916, and the $645.00 charge to the account of bills receivable, entered on the books after May 1, 1917, I think that the evidence both for the defendant in error and for the plaintiff in error concurs in showing affirmatively that such portions of such liability were occasioned by acts of said employee which did not occur "during the continuance of (said) bond," but prior thereto, namely, in 1916.   As to the item of $645.00, the case for the defendant in error rests upon the assumption that the loss to such defendant occurred when the entry of this sum was made on the books.   There is no other evidence in the case to sustain the position that this loss occurred during the continuance of the bond.   This seems to me to be an untenable assumption.   The book entry in question was made of past transactions.   As I view the matter, the loss involved occurred when such transactions actually occurred, not when the entry of them was made on the books. As to the item of $45.00, I think there is no evidence in the case tending to show that there was anything more than the personal indebtedness of said employee for the balance owing by him on the stock of the club issued to him, not by himself alone, but by another and proper officer of the club, the stock being merely countersigned by the former as in the case of other issues of stock.   The failure of the said employee to produce the note has not, so far as appears from the evidence, occasioned any loss to the defendant in error of the $45.00 balance owing upon it; and if it did, in so far as the note is concerned, the loss was the actual value of the note (which is not shown in evidence), not the balance owing thereon.

I think, therefore, that there was not sufficient evidence of that convincing character which is requisite to prove fraud or dishonesty to support the verdict of the jury against the plaintiff in error, and hence, for this reason, I am compelled to dissent from the majority opinion.